**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA, ex rel. MELISSA HIGGINS,** | **CASE No.: 8:14-cv-2769-T-33AEP** |
| **Plaintiffs,** | |
| **v.** | **FIRST AMENDED COMPLAINT** |
| **HEALTHSOUTH CORPORATION n/k/a ENCOMPASS HEALTH CORPORATION,** | |
| **Defendant.** | |

Plaintiff and Relator Melissa Higgins ("Relator") files this First Amended Complaint against Defendant HealthSouth Corporation ("HealthSouth"), n/k/a Encompass Health Corporation ("Encompass"), and alleges the following:

**I.     INTRODUCTION**

1.   This action was originally filed to recover treble damages and civil penalties on behalf of the United States of America in connection with the defrauding of the United States Government ("Government") by HealthSouth.

2.    Between approximately 2007 through the June 28, 2019 settlement with the United States Department of Justice ("DOJ"), Encompass improperly admitted and held patients in its inpatient rehabilitation facilities ("IRFs") in order to generate improper and excessive fees and fraudulent billings to Medicare, Medicaid, and other public and private health insurers including, among others, TriCare, in violation of federal and state law, including the FCA.

3.   This action was originally filed in the United States District Court for the Northern District of Texas, and was subsequently transferred to this Court by the Government on or about November 2014.

4.   After an extensive investigation that lasted several years, on June 28, 2019, Encompass, the nation's largest operator of IRFs, reached a settlement agreement with the United States Department of Justice whereby it agreed to pay $48 million to resolve allegations that some of its IRFs provided false information to Medicare to maintain their status as an IRF and to earn a higher rate of reimbursement, and that some admissions to its IRFs were not medically necessary.

5.   To effectuate this settlement, the Government filed an Unopposed Motion to Intervene For Purposes of Settlement in this case and two others.  These motions were granted by the Court on June 27, 2019.

6.   Pursuant to the settlement agreement and this Court's June 27, 2019 Order, the Government and Relator Higgins filed a Joint Stipulation of Dismissal on July 2, 2019 in which, *inter alia*, Relator Higgins agreed to the dismissal of only her Federal *qui tam* claims  pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA") against Encompass, preserving her retaliation claims pursuant to 31 U.S.C. § 3730(h), as well as her claims for attorneys' fees, costs and expenses pursuant to U.S.C. § 3730(d) which Encompass refused to address as part of the overall settlement with the Government.[1]  The Court entered an Order approving the Stipulation of Dismissal on July 3, 2019.  As a reward for the successful prosecution and resolution of Relator's *qui tam* claims, the Government agreed to pay Relator Higgins (and the Relators from the other two intervened cases) a relator's share from the settlement proceeds.  That payment will be forthcoming in the next several weeks. The various States that are still negotiating a settlement agreement with Encompass have also agreed to pay Relator Higgins and the other two Relators the same Relators' Share percentage as was paid by the Government.

---

[1] As a prevailing plaintiff, Relator is entitled to the payment of her attorneys' fees, costs and expenses pursuant to U.S.C. § 3730(d).  However, as of the date of this filing, Encompass has not yet agreed to pay such fees.

## II.    SUMMARY OF THE ALLEGATIONS

7.  Encompass is the largest owner and operator of IRFs in the United States. Encompass (then HealthSouth) earned net revenues of approximately $1.8 billion in 2009, $1.9 billion in 2010, $2.0 billion in 2011, $2.2 billion in 2012, $2.3 billion in 2013, $2.4 billion in 2014, $3.2 billion in 2015, and $3.7 billion in 2016.

8.  Encompass' IRF segment represented 80.3 percent of Encompass'(then HealthSouth) net operating revenues for 2017 – approximately $3.19 billion of $3.97 billion.  With the HealthSouth/Encompass merger in 2018, the combined company's IRF segment net revenues continued to rise to $3.24 billion, constituting approximately 76 percent of Encompass' net operating revenues for 2018.

9.  In 2018, revenues from Medicare represented approximately 73.4 percent of HealthSouth's total revenues from inpatient rehabilitation, with another 2.8 percent coming from Medicaid.

10. Encompass facilities treat patients who have suffered a traumatic event, such as a brain injury or stroke, or suffer from some debilitating condition, which has caused a substantial loss of physical functioning.

11. Encompass' provision of rehabilitative care to these patients is meant to restore patients to a level of functioning that allows them to return home with limited supervision and assistance from a family member or home attendant.

12. Despite a settlement of FCA claims in 2004, in which HealthSouth settled allegations by the United States Government for $325 million for, among other things, improperly and excessively billing for particular healthcare services, the major inpatient rehabilitation care conglomerate continued to defraud the Government on a massive scale.

13. Encompass defrauded the Government by knowingly admitting and readmitting Medicare eligible patients for its IRFs that do not meet the federal Centers for Medicare and Medicaid Services ("CMS") criteria for  inpatient rehabilitation care and billing the Government for the services HealthSouth facilities provide to those patients.

14. In order to perpetrate this billing scheme, Encompass' IRFs circumvented and directly violated several Medicare regulations.

15. First, Encompass violated the Medicare program's compliance threshold, known as "the 60 percent rule" or "CMS-13." 42 CFR § 412.29 (b)(2).

16. The 60 percent rule requires that at least 60 percent of an IRF's total patient population at all times meet one of 13 medical conditions designated by CMS.

17. Between at least 2007 through the June 28, 2019 settlement with the DOJ, Encompass patient recruiters, known as "marketing liaisons," caused IRF admitting physicians to document a diagnosis, usually Disuse Myopathy or "DM," not present in the acute care medical record or patient's past medical history in order to qualify the patient for admission to the IRF under the 60 percent rule.

18. This practice caused the admission of many patients to Encompass IRFs that were not qualified under the CMS guidelines resulting in millions of dollars in unnecessary expenditures by Medicare, and fraudulent earnings to HealthSouth.

19. Second, Encompass violated Medicare regulations requiring that all patients and treatments meet a "reasonable and necessary" standard of care in order to be covered by Medicare.  The "reasonable and necessary" standard mandates that patients must, among other things, be able to withstand an intensive, multi-disciplinary 3 hour/5 day per week rehabilitation program (or, for properly documented patients, 15 hours spread over the course of 7 days) and

must be capable of showing measurable improvement of their physical impairment though the course of their stay. 42 CFR § 412.622.

20. Between at least 2007 through the June 28, 2019 settlement with the DOJ, Encompass IRFs routinely admitted patients who did not and could not meet these guidelines.  The patients admitted in violation of the Medicare guidelines were, in many cases, too sick, too frail, too incapacitated, or too unmotivated to tolerate the intensive level of  therapy required under Medicare.

21. As a result, treatments were forced upon patients who could not withstand them, putting the patients at greater risk of injury, and costing the Government hundreds of millions of dollars in unnecessary Medicare payments.

22. Thus, while at Encompass (then HealthSouth), Relator witnessed that rather than the diagnosis driving the patients' treatment, the need to meet the 60 percent threshold necessary for HealthSouth facilities to qualify as IRFs drove the diagnosis.  As a result, between at least 2007 through the June 28, 2019 settlement with the DOJ, Encompass also engaged in persistent "up-coding," by billing patients' Medicare, Medicaid or third-party insurance for a higher, more expensive level of rehabilitation service than that actually rendered, especially for services relating to the diagnosis of disuse myopathy.

23. Finally, between 2007 and the June 28, 2019 settlement with the United States Department of Justice, Encompass also violated CMS regulations by failing to discharge patients who were not able to tolerate the intense level of IRF services or were unable to make significant functional gains.  These patients required a lower level of care in a skilled nursing facility ("SNF") or more appropriate care facility ahead of their CMS projected discharge dates.

Encompass failed to discharge these patients, however, in order to avoid a financial penalty for early discharge to an SNF.

24. Encompass facilities violated CMS criteria and caused the fraudulent withholding of millions of dollars from the Government, in violation of the FCA, by keeping patients beyond when it was appropriate to discharge them in order to avoid the Medicare payment penalty.

25. Encompass strongly encouraged employees to admit patients who did not qualify for Medicare admission based on their acute diagnosis, by incentivizing them to drive up patient numbers, by documenting "Disuse Myopathy", and putting pressure on employees that did not cooperate.

26. Encompass offered substantial bonuses to the marketing liaisons based on the number of patients that the liaisons admitted to the hospital.  The marketing liaisons made visits, sometimes unsolicited, to hospitals, nursing homes or SNFs, acute care facilities, assisted or independent living facilities ("ALFs/ILFs"), group homes, and patients' homes, pressuring patients, or their families, to engage HealthSouth facilities for services the patients did not need, or that were inappropriate at the time of the liaison consultation.

27. When speaking with the patients, marketing liaisons were often misleading in explaining the rehabilitation criteria and the requirements of the patient during their stay in order to be in compliance with the CMS payment.

28. Further, between 2007 through the June 28, 2019 settlement with the DOJ, Encompass management regularly threatened hospital staff with reprisals and termination when they failed to "hit their numbers" or did not "play ball," with the improper and illegal revenue generating tactics.

6

29. Since at least 2007, Encompass employees have falsified reports, violated most if not all of the Medicare guidelines related to IRFs, and fraudulently billed the Government for hundreds of millions of dollars under the Medicare program for services provided to these patients despite knowing that those services are not covered under Medicare.

30. In sum, HealthSouth defrauded the United States Government, state governments, and third-party insurers out of hundreds of millions of dollars by improperly admitting and readmitting patients that did not meet criteria under the Medicare program, improperly billed Medicare, Medicaid and third-party insurers for the services provided to these inappropriately admitted patients, charging more than the actual value of the services, and unlawfully funneled unearned taxpayer dollars into its pockets.

### III. SUMMARY OF THE RETALIATION ALLEGATIONS

31. Relator, Director of Therapy Operations for a then-HealthSouth facility in Arlington, TX during most of the relevant time period, began reporting concerns about the facility's fraudulent and unlawful admitting and billing practices soon after she discovered the scheme.

32. Relator reported these concerns up the chain of command internally and spoke about them with other HealthSouth employees at other facilities.

33. Relator discovered that other staff and management level HealthSouth employees in Arlington and at other facilities shared her concern with the level of care being provided to patients, the fraudulent billing practices conducted by HealthSouth facilities, and the treatment of staff that did not cooperate in HealthSouth's unlawful billing procedures.

34. Relator's complaints did not go unnoticed.  At the end of 2010, HealthSouth Arlington began stripping Relator of her regional and local responsibilities.  One by one her job responsibilities were being taken away from her until she was forced to resign in June 2011.

## IV.    JURISDICTION AND VENUE

35. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. § 3729, *et seq.*

36. In addition, the FCA specifically confers jurisdiction upon United States District Courts under 31 U.S.C. § 3732.  This court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in the Middle District of Florida.

37. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because certain of the acts complained of herein occurred in or affected the Middle District of Florida.

38. This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because the False Claims Act authorizes nationwide service of process and Defendant has sufficient minimum contacts with the United States of America.

39. In accordance with 31 U.S.C. § 3730(b)(2), this Complaint was originally filed *in camera* and remained under seal for several years until the Court ordered that the seal be lifted on April 1, 2019.

40. Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in his possession contemporaneous with the filing of the Complaint. Relator complied with this provision by serving copies of the initial Complaint filed in this matter upon Sarah R. Saldaña, former United States Attorney for the Northern District of Texas, and upon the Honorable Eric H. Holder, former Attorney General of the United States (both individuals held these positions at the time of the filing of the initial Complaint).  Relator also previously provided substantially all material evidence and material information in her

possession to the Office of the United States Attorney for the Northern District of Texas and the United States Department of Justice.

41. This Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" because she has provided her information voluntarily to the Government before filing her original complaint, and has knowledge which is both direct and independent of any public disclosures to the extent they may exist.

## V.    THE PARTIES

42. Relator, Melissa Higgins, is a former Director of Therapy Operations for HealthSouth Rehabilitation Hospital of Arlington ("HealthSouth Arlington") and a resident of Arlington, TX. She has worked in the rehabilitation services industry for the past 20 years, entering the field almost immediately upon graduating with a Bachelor of Science degree in Physical Therapy from Southwest Texas State University in December 1996.  A licensed physical therapist for the State of Texas, Relator has held several different levels of employment for various rehabilitation hospitals, all within the HealthSouth, now Encompass system, beginning in 2000.  In December 2004, Relator was hired by HealthSouth Arlington as the Director of Therapy Operations, and the Regional Director of Therapy Operations for the State of Texas.  She held this position for seven years until her forced resignation in June 2011.

43. Relator is an original source and has direct, personal, and independent knowledge of the information upon which the allegations herein are based.

44. Defendant HealthSouth Corporation was incorporated in Delaware in 1984 and is headquartered in Birmingham, Alabama.  HealthSouth is duly authorized to conduct business within the State of Texas and the State of Florida.  Encompass is the result of the merger

between HealthSouth Corporation and Encompass Home Health & Hospice.  The corporate

name change became effective January 1, 2018.

## VI.   GOVERNING LAWS, STATUTES, AND REGULATIONS

### A.   <u>The False Claims Act</u>

45. Originally enacted in 1863, the FCA was substantially amended in 1986 by the False

Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to recover

losses sustained as a result of fraud against the United States.  Further clarifying amendments

were adopted in May 2009 and March 2010.

46. The FCA imposes liability upon any person who "knowingly presents, or causes to be

presented [to the Government] a false or fraudulent claim for payment or approval"; or

"knowingly makes, uses or causes to be made or used, a false record or statement material to a

false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false

record or statement material to an obligation to pay or transmit money or property to the

Government, or knowingly conceals or knowingly and improperly avoids or decreases an

obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(A),

(B), (G).  Any person found to have violated these provisions is liable for a civil penalty of at

least $10,781 and up to $21,563 for each such false or fraudulent claim, plus three times the

amount of the damages sustained by the Government.

47. Significantly, the FCA imposes liability where the conduct is merely "in reckless

disregard of the truth or falsity of the information" and further clarifies that "no proof of specific

intent to defraud is required." 31 U.S.C. § 3729(b)(1).

48. The FCA also broadly defines a "claim" as one that includes "any request or demand,

whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

49. The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal without service on any Defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

50. The request of federal and state reimbursement for the provision of medical services which fails to meet the criteria set forth in federal and state statutes and regulations constitutes a violation of the FCA. In this action, HealthSouth knowingly and routinely admitted and readmitted patients who did not qualify for federal and state reimbursement, administered treatments to patients that did not qualify for reimbursement, or, if anything, qualified for a lower reimbursement, and held patients for excessive lengths of stay in violation of the Medicare program.

51. The FCA also protects employees, contractors, and agents who engage in protected activity (such as, among other things, refusing to violate the FCA or raising concerns

within the company regarding potentially illegal activities) from retaliation in the form of their being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment." 31 U.S.C. § 3730(h)(1).

52. A relator who prevails in an anti-retaliation action under the FCA may recover, among other things: reinstatement; double back pay, plus interest; special damages, which include litigation costs, reasonable attorney's fees, emotional distress, and other noneconomic harm from the retaliation. 31 U.S.C. § 3730(h)(2).

53. A prevailing relator is also entitled to the payment of her attorneys' fees, expenses, and costs associated with her *qui tam* action.  31 U.S.C. § 3730(d)(2) (a prevailing relator shall "receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.").

## B.       Federal Government-Funded Health Assistance

### 1.       Medicare Generally

54. Medicare is a federal government-funded medical assistance program, primarily benefiting the elderly, that was created in 1965 when Congress enacted Title XVIII of the Social Security Act, ("Title XVII"), 42 U.S.C. § 1395, *et seq.*  Medicare is administered by CMS, which is a division of the U.S. Department of Health and Human Services ("HHS").  Medicare covers inpatient rehabilitation services and programs through Medicare Part A.

55. Under the Medicare program, payments for services provided by IRFs to Medicare eligible patients are made by the Government prospectively based upon a formula that combines the patient's primary diagnosis, comorbidities, and functional level upon admission.  Using these

three factors a Government formula determines the patient's length of stay ("LOS" or "Rand" [2])

and payment.  Patients that fail to comply with the Medicare requirements during their stay in the

IRF are required to be discharged according to Chapter 1, Section 110 of the CMS Manual.  Due

to the prospective payment system of Medicare payments, IRFs are paid in advance of treatment

and subject to a payment penalty as a result of an early discharge of a patient to a nursing

home/SNF.

> **2.**      **Compliance Requirements Under the 60 Percent Rule**

56. Federal law requires that at least 60 percent of the total patient population of an IRF

be diagnosed with 1 of 13 medical conditions in order for the hospital to continue to retain the

IRF designation and receive Medicare payments for its patient care according to the IRF

payment schedule. 42 CFR § 412.29 (b)(2).

57. Among those medical conditions which qualify under the "60 Percent Rule" are:

- Stroke;

- Spinal cord injury;

- Congenital deformity;

- Amputation;

- Major multiple trauma;

- Fracture of femur (hip fracture);

- Brain injury;

- Neurological disorders, including multiple sclerosis, motor neuron diseases, polyneuropathy, muscular dystrophy, and Parkinson's disease;

- Burns;

---

[2] "Rand" is the product of a Government formula for determining a patient's length of stay based on diagnosis and functional level.  Rand and LOS are therefore synonymous.

- Active, polyarticular rheumatoid arthritis, psoriatic arthritis, and seronegative arthropathies resulting in significant functional impairment of ambulation and other activities of daily living that have not improved after an appropriate, aggressive, and sustained course of outpatient therapy services or services in other less intensive rehabilitation settings immediately preceding the inpatient rehabilitation admission or that result from a systemic disease activation immediately before admission, but have the potential to improve with more intensive rehabilitation;

- Systemic vasculidities with joint inflammation, resulting in significant functional impairment of ambulation and other activities of daily living that have not improved after an appropriate, aggressive, and sustained course of outpatient therapy services or services in other less intensive rehabilitation settings immediately preceding the inpatient rehabilitation admission or that result from a systemic disease activation immediately before admission, but have the potential to improve with more intensive rehabilitation;

- Severe or advanced osteoarthritis (osteoarthrosis or degenerative joint disease) involving two or more major weight bearing joints (elbow, shoulders, hips, or knees, but not counting a joint with a prosthesis) with joint deformity and substantial loss of range of motion, atrophy of muscles surrounding the joint, significant functional impairment of ambulation and other activities of daily living that have not improved after the patient has participated in an appropriate, aggressive, and sustained course of outpatient therapy services or services in other less intensive rehabilitation settings immediately preceding the inpatient rehabilitation admission but have the potential to improve with more intensive rehabilitation. (A joint replaced by a prosthesis no longer is considered to have osteoarthritis, or other arthritis, even though this condition was the reason for the joint replacement.); and,

- Knee or hip joint replacement, or both, during an acute hospitalization immediately preceding the inpatient rehabilitation stay and also meet one or more of the following specific criteria:

  o The patient underwent bilateral knee or bilateral hip joint replacement surgery during the acute hospital admission immediately preceding the IRF admission.
  o The patient is extremely obese with a Body Mass Index of at least 50 at the time of admission to the IRF.
  o The patient is age 85 or older at the time of admission to the IRF.

42 CFR § 412.29 (b)(1)(iii)(2).

**3.** **Prohibitions Against Claims for Services that are Not Medically Necessary or are Otherwise False or Fraudulent**

58. Under federal law, government reimbursement is prohibited if the item or service is not "reasonable and necessary for the diagnosis and treatment of an illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

59. In order for a claim for reimbursement of inpatient rehabilitation services to be considered "reasonable and necessary," there must be a reasonable expectation that a patient meets all of the following:

> i.  Requires the active and ongoing therapeutic intervention of multiple therapy disciplines (physical therapy, occupational therapy, speech-language pathology, or prosthetics/orthotics therapy), one of which must be physical or occupational therapy.
>
> ii. Generally requires and can reasonably be expected to actively participate in, and benefit from, an intensive rehabilitation therapy program. Under current industry standards, this intensive rehabilitation therapy program generally consists of at least 3 hours of therapy (physical therapy, occupational therapy, speech-language pathology, or prosthetics/orthotics therapy) per day at least 5 days per week….Benefit from this intensive rehabilitation therapy program is demonstrated by measurable improvement that will be of practical value to the patient in improving the patient's functional capacity or adaptation to impairments. The required treatments must begin within 36 hours from midnight of the day of admission to the IRF.
>
> iii. Is sufficiently stable at the time of admission to the IRF to be able to actively participate in the intensive rehabilitation therapy program that is described in paragraph (a)(3)(ii) of this section.
>
> iv. Requires physician supervision by a rehabilitation physician, defined as a licensed physician with specialized training and experience in inpatient rehabilitation. The requirement for medical supervision means that the rehabilitation physician must conduct face-to-face visits with the patient at least 3 days per week throughout the patient's stay in the IRF to assess the patient both medically and functionally, as well as to modify the course of treatment as needed to maximize the patient's capacity to benefit from the rehabilitation process.

42 CFR § 412.622.

**4.      Medicare Regulation of the Pre- and Post-IRF Admission Process**

60. Once a Medicare eligible patient is referred to the IRF, the pre-admission and post-admission process is controlled by the provisions of the Medicare program under 42 CFR § 412.622.

61. Upon referral, a pre-admission screening must be conducted by a licensed or certified clinician, as required under the Medicare program, within 48 hours of admission for treatment at inpatient rehabilitation facilities.  42 CFR § 412.622(a)(4)(i)(A).[3]

62. The Medicare program also requires that the pre-admission screening include a comprehensive review of the patient's medical history and determine, as an initial matter, whether the patient is appropriate for inpatient treatment under Medicare's "reasonable and necessary" standard. *Id*.

63. During the first three calendar days of admission, the IRF must calculate the patient's Functional Independence Measure ("FIM") score.  FIM is a multi-disciplinary assessment developed by the Rand Corporation that measures the burden of care for a particular patient and the amount of assistance that the patient would need to perform everyday activities.

64. FIM contains a checklist of functions each of which is scored individually for the patient.  Upon completion of the test, each score is added together.  That total score, along with the patient's primary diagnosis, taking into consideration the presence of any comorbidities, has a corresponding length of stay which is used in determining the cost of services for a patient.  Medicare reimburses IRFs prospectively based on a formula using this information.

65. Once the patient is admitted, a post-admission physician screening must be completed

---

[3] Encompass routinely uses clinicians of ancillary services not qualified to perform a comprehensive assessment and make judgments about appropriateness for rehabilitation, such as respiratory therapist and social workers.  These ancillary staff do not have the comprehensive medical knowledge to complete pre-admission screenings that are used to determine if the patient meets the medical necessity criteria per CMS requirements.

within 24 hours that documents the patient's status upon admission.  42 CFR § 412.622(a)(4).

66. An overall plan of care must also be outlined at this time by a rehabilitation physician with input from an interdisciplinary team of rehabilitation staff.   42 CFR § 412.622(a)(4)(iii).

67. The Medicare program requires that therapy treatments begin within 36 hours of the midnight of the day of admission.  42 CFR § 412.622(a)(3)(ii).

68. Once the treatment begins, the Medicare program requires that patients are monitored by doctors closely, consisting of 3 face-to-face visits, 3 days per week throughout the course of their stay, to ensure that the continued care is appropriate and remains reasonable and necessary under the circumstances. 42 CFR § 412.622(a)(3)(iv).

## VII.    SPECIFIC ALLEGATIONS

### A.    <u>Encompass' Market Dominance and the Shift from Patient to Profit Driven Care</u>

69. Since its incorporation in 1984, HealthSouth (now Encompass) has grown to become one of the nation's largest healthcare providers, and the nation's largest owner and operator of inpatient rehabilitation hospitals in terms of revenues, number of hospitals, and patients treated and discharged.

70. In 2003, at its height, HealthSouth (now Encompass) had over 1800 facilities across the globe, over $4.5 billion in revenue, and over 60,000 employees.

71. In 2006, HealthSouth substantially reduced its operations to largely focus on inpatient rehabilitation services.

72. HealthSouth (now Encompass) currently has a growing fleet of facilities that includes approximately 130 inpatient rehabilitation hospitals located in 32 states and in Puerto Rico, with an additional  220 home health and 58 hospice agencies located across the country and in Puerto Rico.

17

73. HealthSouth's (now Encompass) facilities across the country are divided into six regions: Northwest, Southwest, West, Northeast, Southeast, and Central.

74. Texas and its 23 hospitals are part of the Southwest region, which has 30 hospitals all together.

75. In the years prior to its merger with Encompass, HealthSouth's revenues averaged close to $2.8 billion per year.

76. A large majority of HealthSouth's (now Encompass') patients nationally are 65 or older and receive Medicare benefits.

77. HealthSouth's (now Encompass') services span a wide-range of inpatient rehabilitation needs including recovery from conditions such as stroke and other neurological disorders, orthopedic, cardiac and pulmonary conditions, brain and spinal cord injuries, and amputations.

78. The purpose of the inpatient rehabilitation services offered by HealthSouth (now Encompass) facilities, as opposed to acute care facilities (short-term care) and nursing homes (long-term care), is to restore patients to a level of functioning that allows them to return home and care for themselves, or to be cared for, on a limited basis, by a family member or home attendant.

79. For most of Relator's eleven year career within the HealthSouth IRF system, she found her work satisfying and the environment largely focused on improving the lives of its patients.

80. In 2007, however, a recommitment to the enforcement of the Medicare regulations by CMS and the Government, particularly the 60 percent rule, changed the culture at HealthSouth and the landscape of the inpatient rehabilitation industry as a whole.

18

81. In 2002, CMS put a moratorium on what was then the "75 percent rule" due to inconsistent enforcement of the rule by financial intermediaries and claims processing contractors.  CMS slowly reintroduced the rule in 2004 and firmly reestablished it in 2007 as the "60 percent rule."  The Government recommitted to enforcing the requirement that a minimum percentage of IRF patient populations fit into the 13 CMS diagnostic categories.

82. As an unintended consequence, the tighter regulations sharply increased competition among the IRFs in regions throughout the country because the patient pool of Medicare eligible patients was suddenly and substantially diminished.

83. In order to continue to thrive, HealthSouth shifted its focus from patient care to the bottom line, creating a "carrot and stick" pressure filled environment in which employees were rewarded for taking steps to drive up revenues, improper or otherwise, and punished for failing to "make their numbers" and cooperate with a rapidly spreading corner-cutting approach.

84. The Relator first began to notice this change in 2008 when the focus of weekly conference calls headed by Regional Director of Marketing Operations Cherie Bligh shifted gradually, but unmistakably, from the enhancement of patient care to patient volume and rates of admission.  Numbers and volume consumed the weekly calls and Relator and other staff member knew that the pressure came down from the highest levels of HealthSouth management and began to permeate throughout the system of facilities.

85. As a result of this change in culture, patient populations soared while the level of patient care suffered and pressure on staff increased.

86. Employees were pressured to circumvent the Medicare regulations in order to meet revenue goals.  This circumvention of Medicare regulations from the very beginning of the process, starting with patient recruiting, resulted, both directly and indirectly, in the fraudulent

billing practices and FCA violations described herein and in a reduction in the level of care provided to patients.

**B.**     **Marketing and Patient Recruiting Caused the Admission of Patients Inappropriate for Inpatient Rehabilitation Care and Ineligible for Medicare Benefits**

87. The new-profit driven regime at HealthSouth most notably took form through the expenditure of enormous resources on marketing and patient recruiting.

88. HealthSouth employed marketing professionals to visit various patient settings, including acute care facilities, nursing homes or SNFs, ALFs/ILFs, group homes, and patient homes to find potential patients and generate business in order to compete in, and continue to dominate, the IRF market.

89. Armed with marketing brochures and pamphlets touting the services provided by HealthSouth facilities, HealthSouth Arlington marketing liaisons approached potential patients who had either suffered a traumatic event or were suffering from some crippling condition.

90. Relator and other staff members within HealthSouth knew that liaisons would say whatever was necessary to convince the family to enroll a patient in HealthSouth's IRF programs—including outright lies—leaving behind distressed families after the patient failed to progress.

91. The liaisons gathered data to complete the pre-admission screening form and determine the patient's eligibility for inpatient rehabilitation care.

92. The liaisons were required to be clinically trained to evaluate candidates for rehabilitation services and were required to verify the candidates' suitability for services. Liaisons were required, under CMS regulations, to conduct objective assessments of patients and the patients' qualifications for rehabilitation, as outlined above. However, the HealthSouth liaisons were not qualified to make such a determination, which was more appropriately made by

a clinician or other medically trained personnel.

93. Following the pre-admission screening, the liaison would produce a report that concluded with a diagnosis of the patient, invariably one appropriate for inpatient rehabilitative care and covered under the Medicare guidelines.

94. These reports were in line with HealthSouth's practice pursuant to which there were to be "no denials in the field."  HealthSouth training documents exist in which this illegal and unethical directive appears to have been given nationwide.

95. These pre-admission screening reports were shown to hospital staff, prior to admission, and were often rubber stamped by overwhelmed physicians before admitting the patient.  A common concern among these HealthSouth physicians was the lack of complete information given to them verbally that resulted in their approval of patients without full knowledge of the patients' clinical presentation.

96. To get patients to agree to admission, the liaisons promised unattainable improvements of their condition and misled the patients about the length of time they would stay in the IRF setting.

97. In one example, a marketing liaison promised a severely obese patient that her condition would improve with just a 20 day stay at HealthSouth Arlington. With a very low functional level, she was virtually immobile, and little to no motivation to participate in therapy, the hospital admitted the patient based on the liaison's recommendation.  Not only are these types of patients a bane on taxpayer dollars, but they heavily burdened hospital staff already under a great deal of pressure to keep up with rising patient numbers, reducing their ability to care for other patients.

98. Marketing liaisons were incentivized to falsify reports and push patients through the

revolving door at HealthSouth IRFs because they were paid substantial bonuses for, and their job performance was entirely based upon, the volume of admitted patients generated by their recruitment tactics.  Thus, each admission, no matter the patient's condition or inability to meet CMS criteria, padded the liaisons' bonus and allowed them to meet performance goals.  As a result, the hospital collected prospectively for its rehabilitation services with very little oversight or accountability.

99. There were three distinct and damaging consequences of this recruitment and bonus system that resulted in greater profits to HealthSouth, and diminished care to its patients: 1) marketing liaisons misdiagnosed patients to create a diagnosis that complied with the CMS-13 diagnostic threshold; 2) patients were admitted, based on liaison recommendations, that were not appropriate for inpatient rehabilitative care and did not meet the "reasonable and necessary" standard for Medicare coverage; and 3) patients were held for entire lengths of stay that should have been discharged for non-compliance so that HealthSouth could avoid a payment penalty.

### 1.    **Patients Misdiagnosed under CMS-13**

100.    The 60 percent rule requires compliance with the CMS-13 list of conditions at the end of each cost reporting period.  IRFs that fail to comply lose their special classification status under the guidelines and are reverted to acute care hospital status, paid under a different schedule with different coverage requirements and with reimbursement rates approximately one-half of an IRF.

101.    Acute care facilities are short term care hospitals generally reserved for patients suffering from a severe injury or episode of illness, or recovering from surgery, that require active, short-term care.  The Medicare guidelines for these facilities are even more demanding than those for IRFs, making the IRF designation more desirable and more profitable for health

care providers.  This profitability is aided by the fact that IRFs are reimbursed at a level that is substantially higher than that of non-IRF facilities.

102.     In order to maintain compliance with the 60 percent rule, which HealthSouth monitored daily, the marketing liaisons, without any medical or clinical training, regularly misdiagnosed patients with conditions they believed could be found on the CMS-13 list.

103.     For example, in 2009, HealthSouth Arlington experienced a dramatic rise in the percentage of patients suffering from a condition known as "disuse myopathy."

104.     Separately, the words "disuse" and "myopathy" are proper healthcare terms. Together, however, they are nonsense.

105.     In the medical field, "disuse" retains its ordinary meaning, *i.e.*, lack of use.  The medical term "myopathy" refers to any disorder of the muscle tissue.  *See, e.g.*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (32d Ed. 2011); TABER'S CYCLOPEDIC MEDICAL DICTIONARY (22d Ed. 2013).

106.     According to HealthSouth, disuse myopathy is a neurological disorder, covered under CMS-13 list, which supposedly afflicts limited mobility patients with muscle weakness as a result of non-use of their muscles.  Though extremely rare among the general population across the country, numerous HealthSouth Arlington patients were diagnosed with the condition by marketing liaisons after 2008 (using ICD-9 billing code 359.89/ICD-10 billing code G72.89) – a practice that continued to 2016, at which point HealthSouth moved onto different misdiagnoses, such as critical illness myopathy and encephalopathy.  The symptoms of disuse myopathy are common, making the condition an easy fall back diagnosis for many other, or no real, ailments.

107.     Disuse myopathy is not a medically recognized pathology.  No medical reference text discusses, provides a definition of, or lists symptoms for disuse myopathy, let alone provides

a standardized course of treatment.

108.    Disuse myopathy appears to have been invented by two of HealthSouth's national coders who traveled to HealthSouth facilities to train employees on its use and benefits of admitting patients for HealthSouth to receive Government payments for and maintaining the numbers required to meet the 60 Percent Rule.

109.    Importantly, no document promulgated by the Government recognizes or even mentions the concept of disuse myopathy.  The ICD-9 code database was published in 1979 and contains about 13,000 diagnostic codes, with forty-nine (49) distinct codes provided for different types of myopathies (*e.g.*, critical illness, alcoholic, or ocular myopathy).  There is no separate code for disuse myopathy in ICD-9.

110.    The ICD-10 database was published in 2015 and contains about 68,000 diagnostic codes, with sixty-five (65) discrete codes provided for different types of myopathies.   Yet, between the 114 myopathy-specific codes, there is no code for disuse myopathy in ICD-9 or ICD-10.

111.    Finally, CMS publishes thousands of pages of guidance on IRFs every year, listing many types of myopathies.  (*See, e.g.*, CMS IRF website, *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/InpatientRehabFacPPS/index.html).  Again, disuse myopathy is nowhere to be found.

112.    Moreover, nationwide, all non-HealthSouth IRFs combined have used diagnostic code ICD-9 359.89 ("Other Myopathies") for less than 1 percent of all IRF admissions. Specifically, non-HealthSouth IRFs admit patients using code 359.89 for between 0.3 to 0.9 percent of their admissions.

113.    On the other hand, HealthSouth (now Encompass) IRFs across the country

regularly admit substantial numbers of IRF patients using a disuse myopathy diagnosis and code 359.89.  In fact, up to 70 percent of patients at some HealthSouth IRFs were admitted using a disuse myopathy diagnosis and code 359.89.

114.    The false, over-diagnosis of disuse myopathy in order to increase patient population was so blatant, that it became a running joke at the Arlington hospital that the condition had spread like an epidemic, infecting the entire patient population.

115.    Disuse myopathy was also a common admission diagnosis at other HealthSouth facilities.

116.    In fact, HealthSouth established and disseminated a nationwide policy of admitting and retaining unqualified patients – and billing the Government for services provided to these unqualified patients – under the false disuse myopathy medical diagnosis.

117.    The fake diagnosis were made following the liaisons' pre-admission screening at the acute care facilities, nursing homes, or at patient homes, and concluded long reports that were based upon falsehoods and inaccuracies. Often times the liaisons would write "suggestive of Disuse Myopathy" or just "DM" on the patient's admissions paperwork even though the diagnosis was not mentioned in the patient's medical record.

118.    Though required to review these reports, the understaffed, overstretched medical team at the hospital often simply rubber stamped the diagnosis by signing admit screens placed in front of them.  And even when a HealthSouth physician attempted to properly do their job, HealthSouth managers would steer admission candidates away from HealthSouth physicians who refused to recognize disuse myopathy as an admitting diagnosis or were otherwise too thorough in assessing candidates that field liaisons would present for admission.  Thus, HealthSouth Arlington, as well as other HealthSouth IRFs, were admitting patients purely based upon the

untrained marketing liaisons' biased, bonus-driven assessments.

119.     Also, doctors who did not have their own separate practice, and were therefore dependent on HealthSouth, now Encompass, for their economic well-being, admitted many more patients pursuant to a disuse myopathy diagnosis than doctors who had an independent practice.

120.     The conditions misdiagnosed by the marketing liaisons after 2008 were not limited to disuse myopathy, though.

121.     For example, although HealthSouth's abuse of the disuse myopathy diagnosis waned in some hospitals beginning in 2016, HealthSouth, now Encompass, moved onto other fraudulent diagnoses, such as critical illness myopathy and encephalopathy (metabolic and others).

122.     Using HealthSouth materials, HealthSouth management taught HealthSouth staff to improperly convert diagnosis of conditions better suited for other types of care, such as acute care or long-term nursing home care, into inpatient rehabilitation conditions that conformed with Medicare guidelines.

123.     In May 2011, HealthSouth gave a presentation to HealthSouth Arlington staff, including physical therapists, nurses, doctors, and marketing personnel, that presented a slide titled, "Acute Care vs. Possible Rehab [Diagnosis]." The slide contained a list of acute care conditions and a list of corresponding rehabilitation care diagnosis. For example, the slide stated that an acute care diagnosis "debility," can be diagnosed as "disuse myopathy, peripheral myopathy, or osteoarthritis" in order to comply with CMS-13. Similarly, and even more striking, a "patient falling with no medical diagnosis," under acute care, can be diagnosed, according to the HealthSouth Arlington presentation, for rehab as "peripheral neuropathy, Parkinson's, or brain degeneration."

124.    Thus, HealthSouth Arlington and HealthSouth not only fully supported the fraudulent misdiagnosing of patients by hospital staff, they encouraged and promoted the unlawful practice to ensure compliance with Medicare's 60 percent rule.

125.    The 60 percent rule is a self-governing, self-reporting regulation, requiring IRFs to certify compliance once per cost reporting period.  HealthSouth Arlington monitored CMS-13 progress daily, per HealthSouth, now Encompass', rules, in order to ensure compliance - compliance which was consistently met due entirely to the high number of misdiagnosed patients.

126.    Since the reinstitution of the rule in 2007, HealthSouth, now Encompass, and HealthSouth Arlington have falsely certified compliance with the 60 percent rule each year through the most recent cost reporting period.

127.    Accordingly, HealthSouth's false diagnosing of patients resulted in the admission of patients that did not belong in an IRF and exposed them to inappropriate therapies and increased the likelihood of complications with their already precarious condition.  It also resulted in the making of millions of dollars in Medicare payments that would not have been paid, but for the false diagnosis and false certifications made by HealthSouth Arlington and HealthSouth, now Encompass.

128.    All of HealthSouth's disuse myopathy related claims are "false or fraudulent" because they rely on fabricated patient assessments, which disqualify them from Government reimbursement.

129.    Specifically, in order to receive any payment from the Government for treating a Medicare patient, an IRF must perform a "comprehensive, accurate, standardized, and reproducible" assessment, also known as an Inpatient Rehabilitation Facility Patient Assessment

Instrument, or IRF-PAI, of that patient.  42 CFR § 412.606(c)(1).  Indeed, these requirements are explicitly incorporated into Medicare's "conditions of payment" for IRFs.  42 CFR § 412.604. The HealthSouth IRF-PAIs containing disuse myopathy diagnoses are inaccurate, not standardized, and not reproducible because disuse myopathy is not a medically recognized disease.  Because none of HealthSouth's claims for patients with an IRF-PAI disuse myopathy diagnosis were entitled to payment, all such claims are actionable under the FCA as knowingly false or fraudulent.

130.    HealthSouth's disuse myopathy claims were thus false not only because of the fabricated patient assessments, but because HealthSouth, now Encompass, knew that the disuse myopathy patients would experience little to no benefit from admission to a HealthSouth IRF. HealthSouth's disuse myopathy policy and practice was therefore particularly material to the Government, and completely inapposite to the public policies underlying the substantially higher reimbursement of IRFs.

131.    Moreover, without its fraudulently procured and maintained disuse myopathy patients, HealthSouth could not have qualified as an IRF in the first instance.  It is thus clear that HealthSouth was motivated to implement its disuse myopathy policy and practice in order to extract the most possible money from the Government; one revenue stream was created by the increased (but fraudulent) disuse myopathy admissions, and another by the fact that those increased disuse myopathy admissions allowed certain HealthSouth facilities to fraudulently qualify as an IRF.

132.    More importantly, the submission of intentionally inaccurate and false IRF-PAIs render the entire facility unqualified to receive the elevated payments available under the CMS system for rehabilitative care in an inpatient facility, because, many of the HealthSouth facilities

would not qualify under the 60 Percent Rule as an IRF without resorting to the use of disuse myopathy.

133.    HealthSouth, now Encompass, obtained millions to hundreds of millions of dollars in ill-gotten Medicare reimbursements, and avoided millions of dollars in penalties, as a result of these violations.

**2.    HealthSouth Arlington Admitted Patients That Were Inappropriate for Rehabilitative Care and Not Covered under Medicare**

134.    Marketing liaisons also admitted patients to HealthSouth Arlington that were incapable of meeting the Medicare criteria under the "reasonable and necessary" standard.

135.    The marketing liaisons deceived immobile, medically fragile, and unwilling patients or their families through false promises of hope and convinced them to agree to come to HealthSouth Arlington for inpatient rehabilitative care.

136.    The liaisons undertook pre-admission screenings on these patients and made diagnosis that were submitted to hospital medical staff for approval.  Again, these reports and diagnosis were, in most cases, rubber stamped and patients were admitted either without any clinical scrutiny, or with clinical input that went completely ignored.

137.    Among the likely hundreds of patients at HealthSouth IRFs that failed to meet the "reasonable and necessary" standard but were admitted anyway include the following:

- In March 2009, a bed bound patient suffering from severe ataxia, "jerky movements," was admitted despite being a safety concern and not having walked in two years.

- In December 2009, a bed bound, obese patient was admitted who had not walked in over a year.

- In April/May 2010, a patient was admitted with severe dyskinesia, a condition that affects a person's ability to move voluntarily, was admitted despite being bed ridden for two years and lying in fetal position for the majority of the day.

- In May/June 2010, a severely obese woman with virtually no mobility whatsoever was admitted despite her outright refusal to participate in therapy.

- In August 2010, a patient with severe dementia and chronic dysphagia was admitted, despite multiple prior admits and limited functional gains from the previous admission.

138.    These patients were admitted in complete disregard for their conditions, their willingness to participate in therapy, and their ability to make any functional improvements.

139.    The marketing liaisons knew at the time of their admission that the patients could not meet the Medicare regulations but still caused them to be admitted.

140.    Many of these patients that were admitted to HealthSouth Arlington were put back in the SNF they came from immediately upon discharge, in direct contravention of the very purpose for which rehabilitative care is intended – to improve functional independence so that the patient can return home.

141.    In some cases, these same patients were later readmitted to HealthSouth Arlington for therapy despite making limited functional improvement during their previous stays.

142.    Liaisons admitted patients they knew had limited chance of improving because they wanted to generate revenue for HealthSouth and bigger bonuses for themselves.

143.    Marketing liaisons even told prospective SNF patients that they should let HealthSouth Arlington "be your 3 night hospital stay," rather than the SNF.

144.    Marketing liaisons treated HealthSouth Arlington like a hotel and the revolving door of patients kept on spinning.

145.    From approximately 2007 through the June 28, 2019 settlement with DOJ, many physical therapists pushed back, arguing that they should not be treating these types of patients. But the liaisons sought and obtained pressure from management to have these patients admitted and readmitted anyway, despite their poor condition.

146.    In one case, a patient and SNF resident was admitted in August 2010 with no realistic chance of having any functional gains due to her progressively debilitating neurological disease.  Relator, along with others, wanted to deny the patient admission, but the liaison spoke to management who overrode Relator and the staff and pushed the admission through.  This patient, like many others, would later be discharged and sent back to the SNF where she resided, without any improvement, causing the unnecessary expenditure of Medicare dollars.

147.    The admission of these incapacitated patients also negatively impacted the clinical reputation of the therapy department.

148.    HealthSouth clinical staff were evaluated based on the gains made by patients from their treatment.  When the marketing liaisons and hospital management admitted patients with limited chance of making significant functional gains, the therapy staff and leadership were viewed as having done a poor job with patient care.

149.    HealthSouth Arlington therapists routinely complained about the unfairness of admitting patients that were destined to fail.  In response, they were given lectures about how it was their job to try, stay positive, and be a team player, no matter how difficult a case may be.  It was well known that this was code for the mantra "play along," "be a team player," and "keep patients through their Rand or suffer the consequences."

150.    Some doctors also voiced concerns about the types of patients that were being admitted to the hospital.  In August 2010, one doctor at HealthSouth Arlington expressed his outrage to another staff member that the hospital admitted patients who did not meet rehabilitation criteria and failed to discharge them in a timely manner when their condition worsened.  Specifically, the doctor asked, "Why are we admitting them?" "Why are you keeping them here when they don't meet regulations – you must have some reason for keeping them,"

and "who the hell thinks these patients are appropriate for rehab?" Such complaints were common, but fell on deaf ears.

151.    The improper admissions of patients that did not qualify for Medicare coverage occurred throughout the HealthSouth system on a massive scale driven by patient volume, the need to meet the 60 percent rule and desire for huge profits.

152.    The widespread practice led to thousands of FCA violations through the submission of requests for Medicare reimbursement for services that should not have been performed on these patients.

153.    As a result, HealthSouth (now Encompass) improperly earned hundreds of millions of dollars in Medicare payments that it wrongfully withheld from the Government and the American taxpayers.

C.    **HealthSouth Arlington Failed to Discharge Patients to Avoid A Medicare Payment Penalty**

154.    Between 2007 through the June 28, 2019 settlement with the DOJ, HealthSouth has increased scrutiny and pressure on its IRFs to keep all patients who should be discharged to nursing homes/SNFs through their full LOS/Rand, even if the patient was not meeting CMS criteria.

155.    These patients should have been discharged to a less intensive setting or lower level of care according to CMS Manual Publication.  *See* Medicare Benefits Policy, Transmittal 119, Chapter 1, Section 110.2.

156.    Under CMS and Medicare regulations, HealthSouth was expected to base its discharge decisions on clinical symptoms, functional level, and social factors.  No other factors were to be applied to the discharge decision.

157.    Nevertheless, HealthSouth Arlington management routinely instructed staff to

keep patients through their Rand under all circumstances in order to avoid a payment penalty from Medicare.

158.    In many cases, patients failed to meet CMS "reasonable and necessary" standards for either making significant functional gains or therapy intensity participation, but were forced to stay their full LOS/Rand.  This occurred even when their condition was such that they would be more appropriately treated by a less intensive therapy more suited for these patients.

159.    It was more important for HealthSouth that IRFs avoid Medicare payment penalties, than comply with CMS regulations and do what was potentially in the best interest of the patient.

160.    In one case at HealthSouth Arlington, Realtor was warned, "…no patient is to go to SNF without meeting their Rand.  Must have justification if they don't."  These types of directives were common at HealthSouth Arlington and staff understood that their performance evaluations would suffer if they did not follow these instructions.

161.    In or about 2012, as a result of a Government investigation into HealthSouth based on the filing of three *qui tam* actions, HealthSouth installed Dr. Albert Ramirez into the Arlington facility to "clean it up."  Dr. Ramirez stopped the use of disuse myopathy as an admissions diagnosis.

162.    However, after six months, profits had fallen and it was clear the Arlington facility would not meet the 60 percent rule, and Dr. Ramirez was fired.

163.    Admissions quietly reverted to prior practices to increase the population meeting IRF requirements.  HealthSouth employees jokingly told Relator "don't drink the water, there's disuse myopathy in it" because so many new patients were being admitted with that diagnosis.

164.    As a result of this conduct, HealthSouth avoided an obligation to pay a penalty

based on the Medicare guidelines for hundreds of patients in violation of the FCA.

**D.      Relator's Discovery of HealthSouth Arlington's Fraudulent Conduct and Internal Reporting**

165.    The Relator began working for HealthSouth Arlington in December 2004 as the local and regional Director of Therapy Operations.

166.    Prior to that, Relator held various levels of employment with other HealthSouth IRFs since 1997.

167.    As Director of Therapy Operations for HealthSouth Arlington, Relator was responsible for inpatient and outpatient therapy operations, patient outcomes, case management, medical records, the sleep program, and the pain program.  She was, therefore, intimately involved with staffing and patient care, though admission decisions were made by hospital marketing/admissions staff and more senior management.

168.    As Regional Director of Therapy Operations for the State of Texas, Relator served on HealthSouth Regional and National clinical advisory boards, interviewed potential hospital executives for management roles, served as a liaison between local hospital staff  and HealthSouth executives, and performed an informational role to national and regional advisory boards keeping senior staff and executive level HealthSouth personnel across regions abreast of any changes in the CMS regulations and guidelines.

169.    Sometime around 2008, Relator noticed a change in culture at HealthSouth Arlington, and HealthSouth generally, that was driven much more by admissions volume and increasing profits than the clinical outcomes and quality of care administered to patients.

170.    In particular, she quickly became aware, as described above, that the Hospital was admitting patients that were not appropriate for the intensive therapy that HealthSouth Arlington provided and that Medicare paid for.

171.    The admission of patients not suited for the level of care offered by HealthSouth Arlington and not covered by Medicare was an ever-present complaint by hospital staff and administrators.

172.    Relator began reporting internally to staff and management about the improper admitting and billing practices being performed by HealthSouth Arlington around 2008.

173.    Relator was chastised for these reports as not being positive enough and not being a team player. This was a common tactic used by HealthSouth Arlington and HealthSouth management to force employees to play along and not raise issues.

174.    For example, on May 25, 2010, Relator reported to Kelly Harris, Director of Marketing Operations for HealthSouth Arlington, that a patient, bedbound for 10 years with contractures, was improperly admitted to the hospital and was not a rehabilitation candidate "due to the limited functional gains that can be made by a bed bound patient." Mr. Harris virtually ignored Relator's concerns, responding that he understood the patient did not "present an *ideal* rehab candidate" but, that the "real question" was "what are we able to do for him? What functional improvements can be made?"

175.    This kind of response to internal complaints about the kinds of patients being admitted was typical.  In March 2009, Relator was questioned by HealthSouth Arlington CEO Jessica Knox about the status of patients who were being discharged based on their inability to meet Medicare standards.  Relator stated that one patient had dementia and could not meet the 3 hour/day program requirement, while the other had debilitating jerky movements that prevented him from walking or participating meaningfully in any rehabilitation program.  Relator's explanation was met with unequivocal dissatisfaction for her failure to keep patients at the hospital.

176.    At times, the reaction to Relator's complaints turned from expressions of disappointment to outright hostility.  As early as 2008, Relator's job was threatened as a result of her internal reporting.  On October 24, 2008, Relator wrote Marketing Director Kelly Harris and CEO Jessica Knox about a particular patient who had been improperly admitted.  She wrote, "She's a hoyer[4] transfer at the nursing home she's going to go back to the nursing home unless they keep her until she's mod and maybe starting to ambulate.  That's fraud to keep having [patients] come in here from a nursing home when were are not able to benefit them and just send them right back to the nursing home."  CEO Knox shot back, "I swear I will write your ass up if you ever say such a thing to Kelly again.  I am so over you.  All you have to offer is shitty comments.  All day every day.  Everyday you surprise me with doing something extremely positive, it immediately gets cancelled out when you send stuff like this to other members of the team.  You only say things like that to me, or you don't say anything at all.  You are amazing."

177.    In September 2009, Relator sent an email to the regional HR Director expressing concerns about losing her job.

178.    Relator continued to complain internally, up the chain and to other staff members, through the end of 2010.

179.    In November 2010, HealthSouth Arlington, at the direction of HealthSouth, began stripping Relator of her responsibilities at the hospital.

180.    First, the hospital took away control of the sleep program – a program that studied the sleep patterns of hospital patients.  Relator had overseen the program for several years with excellent results and had received the highest evaluation scores, until she began complaining.

181.    Next, in December 2010, HealthSouth Arlington and HealthSouth stripped Relator of her management of the medical records department, another role she served in for

---

[4] "Hoyer" is a transfer device with a sling that is used to safely transfer a totally dependent patient from bed to chair.

several years, and another role in which she was positively evaluated until she began trying to stop HealthSouth from perpetrating the fraud on the Government.

182.    In January 2011, Relator was removed from her regional position as Director of Therapy Operations. Throughout this time period, she continued to speak out against the wrongful and fraudulent hospital billing practices.

183.    Finally, on June 23, 2011 at approximately 8 a.m., Relator was called into the office of the CEO of HealthSouth Arlington, John Oliver, and was followed into the office by Human Resources Director Nancy Rosalis.  Mr. Oliver had a prepared separation agreement on the table, and told Relator that while "these conversations are never easy,"  the Hospital wanted to go in a different direction and needed a "change in leadership" because her "numbers weren't moving."

184.    Relator questioned the process, asking Mr. Oliver why she was given no write up, no action plan, and no options in advance of her termination.  Mr. Oliver told Relator that she had two choices, resign and protect her severance immediately or be terminated immediately. She was told that she needed to leave the premises immediately, and that HR would accompany her to her office, and HealthSouth would send her belongings to her.

185.    Relator was in shock.  She did not immediately sign the forced termination agreement, and instead went to her office – where she was not allowed to speak to anyone or even clean out her office.  She was told that her personal effects would be boxed up and shipped to her, and she was escorted out of the building.

186.    Unable to reconcile the economic fallout of being immediately fired without pay, Relator accepted her forced resignation.

187.    Despite the severe emotional shack and distress, the economic effects of her

termination were as immediate and painful.  Relator would not make a similar salary to that

which she had at HealthSouth until 2015 – approximately four years later.

**E.**      **Similar Fraudulent Practices at Other HealthSouth Hospitals**

188.     Relator is aware that the fraudulent conduct discussed herein was not limited to

HealthSouth Arlington, but was undertaken by other facilities in Texas, as well as at other

facilities from HealthSouth's regions across the county because of her position as Regional

Director and her service on HealthSouth regional and national advisory boards.

189.     Relator discussed the difficulties she had with the billing practices and the

treatment of staff that did not cooperate at HealthSouth Arlington with staff members at other

HealthSouth facilities.

190.     In particular, a former Director of Therapy Operations for HealthSouth

Rehabilitation Hospital of Texarkana discussed the fraudulent practices with Relator extensively.

In one April 22, 2011 email she wrote, "We've had some doozies too…we brought one guy in

that was here in Dec. and refused to do anything and has now done 1.5 hours in the past 3

days…that was his eval and he only finished the PT eval b/c he had to pee.  We've had 5 go

acute oh wait, one died after being here for about 8 hours, so there were only 4 acutes."

191.     In the same email chain, later that day, the Texarkana Director followed, "We get

patients from the SNF and then they go back to the SNF.  What is that about?  Of course, the

liaison documents that the patient has potential to go home.  Right, right…except there isn't any

family to take care of them or the family that is there won't take care of them.  That is wasted

taxpayer money if you ask me.  The bonus thing makes all my staff mad."

192.     Because of her position as Regional Director of Therapy Operations, Relator is

aware of similar complaints at the other HealthSouth hospitals in the Texas region and knows

that the fraudulent conduct occurred in other HealthSouth facilities across the country because she sat on several National Advisory Boards for HealthSouth, and spoke to other Directors from around the country who expressed similar concerns.

193.    Accordingly, the fraud on the Government being perpetrated at HealthSouth Arlington was not limited to that hospital and the Relator believes it happened on a massive scale at most if not all of the other HealthSouth facilities.

**F.**    **Damages Caused by HealthSouth's Unlawful Scheme**

194.    As a result of this unlawful scheme, HealthSouth Arlington and HealthSouth facilitated and caused false, fraudulent, improper billings, inducing the Government to pay potentially hundreds of millions of dollars in reimbursements for improper and fraudulent claims.  HealthSouth's unlawful and fraudulent conduct has earned the company (now Encompass) enormous profits over the last several years.

195.    Through the commission of these unlawful practices, HealthSouth Arlington and HealthSouth submitted and caused to be submitted false certifications certifying compliance with the 60 percent rule when it knew it was not in compliance as a result of the false diagnoses submitted by the marketing liaisons and approved by hospital medical staff.  Such false certifications allowed HealthSouth Arlington and HealthSouth to continue to operate under the IRF status and collect under the payment schedule and Medicare guidelines as an IRF.  Had the Government-funded health insurance program been aware that these activities occurred as a result of the conduct alleged in this Complaint, it would not have continued to pay HealthSouth Arlington and HealthSouth's claims made under the IRF Medicare program.  HealthSouth (now Encompass) wrongfully and fraudulently collected hundreds of millions of dollars in Medicare reimbursements as a direct result of these false certifications.

196.    Further, HealthSouth submitted and caused to be submitted false claims for reimbursement to Medicare and obtained hundreds of dollars worth of payments from the United States.  Under the False Claims Act, such claims were fraudulent because they sought reimbursement for services that were not reasonable and necessary for the patients admitted and were provided as a result of unlawful activities.  Also, all patients admitted with the fraudulent diagnosis of disuse myopathy (ICD-9 code 359.89 or ICD-10 code G72.89) were not entitled to any reimbursement and HealthSouth should have returned any payments received.  As detailed above, many patients did not receive any or all of the required treatments and the Government was overcharged for the services rendered, if any.  Had the Government-funded health insurance program been aware that these activities occurred as a result of the conduct alleged in this Complaint, they would not have paid the claims submitted as a result of HealthSouth's wrongdoing.

197.    Finally, HealthSouth Arlington and HealthSouth Corp.'s wrongful withholding of patients who were set to discharge to a nursing home/SNF to their full LOS/Rand, despite not meeting CMS criteria for functional gains or therapy intensity to avoid payment penalty,  was a wrongful avoidance of an obligation to pay the Government in violation of the FCA.  Had the Government-funded health insurance program been aware that these activities occurred as a result of the conduct alleged in the Complaint, it would have enforced the penalties on HealthSouth Arlington and HealthSouth and avoided overpayment of services in which the patient did not meet the CMS criteria.

## VIII. CLAIMS FOR RELIEF

### <u>FIRST COUNT</u>

### (False Claims Act: Retaliation – 31 U.S.C. § 3730(h))

198.    Relator repeats and realleges the preceding paragraphs contained in this complaint as fully set forth herein.

199.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, HealthSouth has retaliated against Relator for her reporting of and efforts to prevent the unlawful acts described herein.

200.    But-for the illegal retaliatory conduct of HealthSouth officials, Relator would not have resigned from her position with HealthSouth.

201.    As a result, Relator suffered damages in the form of emotional distress and economic loss over several years of retaliation from her internal reporting and lost pay following her forced resignation, and is entitled to double back pay, plus interest, and special damages including reasonable attorneys fees and litigation costs, emotional distress and other non-economic harm.

### <u>SECOND COUNT</u>

### (False Claims Act: Attorneys' Fees, Expenses and Costs – 31 U.S.C. § 3730(d) and 31 U.S.C. § 3730(h))

202.    Relator repeats and realleges the preceding paragraphs contained in this complaint as fully set forth herein.

203.    On June 28, 2019, Encompass reached a settlement agreement with the United States Department of Justice whereby it agreed to pay $48 million to resolve allegations that some of its IRFs provided inaccurate information to Medicare to maintain their status as an IRF

and to earn a higher rate of reimbursement, and that some admissions to its IRFs were not medically necessary.

204.    To effectuate this settlement, the Government intervened in this case and two others.

205.    Pursuant to the settlement agreement, Relator Higgins agreed to the dismissal of her Federal *qui tam* FCA claims against Encompass, preserving only her retaliation claims pursuant to 31 U.S.C. § 3730(h), as well as her claims for attorneys' fees,  costs and expenses pursuant to U.S.C. § 3730(d).

206.    As a prevailing plaintiff on the underlying FCA claims brought on behalf of the United States of America that was paid a Relator's share by the DOJ, Relator is entitled to the payment of her attorneys' fees, costs and expenses pursuant to U.S.C. § 3730(d).  However, as of the date of this filing, Encompass has not yet agreed to pay such fees, costs and expenses.  As a prevailing plaintiff on the underlying FCA claims brought on behalf of the United States of America, Relator is also entitled to the payment of any attorneys' fees and costs incurred in her attempts to collect attorneys' fees, costs and expenses due and owing from Encompass.

207.    Relator is also entitled to the payment of all attorneys' fees and costs incurred in the prosecution of her retaliation claims brought under 31 U.S.C. § 3730(h).

## IX.      DEMANDS FOR RELIEF

**WHEREFORE,** Relator demands judgment against Encompass ordering that:

a.      Relator be awarded all costs and expenses of this action, including attorneys fees as provided by 31 U.S.C. § 3730(d) and any other applicable provision of law;

b.      Relator be awarded two times back pay and special damages flowing from HealthSouth's retaliation and her forced resignation; and,

       c.       Relator be awarded  pre- and post-judgment interest on the awards ordered herein;

and

       d.       Relator be awarded such other and further relief as the Court may deem to be just

and proper.

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.

Dated: July 16, 2019

By: *s/ John S. Vento*
    John S. Vento, Esq.
    TRENAM LAW
    101 E. Kennedy Boulevard, Suite 2700
    Tampa FL 33602
    (813) 227-7483
    JVento@trenam.com

    Robert A. Magnanini, Esq.
    (Admitted *Pro Hac Vice*)
    STONE & MAGNANINI LLP
    100 Connell Drive, Suite 2200,
    Berkeley Heights, NJ 07922
    (973) 218-1111
    rmagnanini@stonemagnalaw.com

    *Attorneys for Plaintiff/Relator*
    *Melissa Higgins*